AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>3133 Peoria Street<br>Unit 211<br>Aurora, Colorado | )<br>)<br>)<br>)<br>)<br>)    Case No. 10-SW-5178-MJW |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____ State and _____ District of _____ Colorado _____ *(identify the person or describe property to be searched and give its location)*:  See Attachment A, which is attached to and incorporated herein.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:  See Attachment B, which is attached to and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ____26____ U.S.C. § _7206(2)_
and the application is based on these facts:

See Attachment C, which is attached to and incorporated herein.

☑ Continued on the attached sheet.

☑ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Anthony R. Romero, Special Agent, IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 14TH, 2010
At 4:25 p.m.

City and state: Denver, Colorado

*Judge's signature*

*Printed name and title*

Attachment A

The business establishment of Taxes Latinos, also known as Taxes Latinos, LLC, is located at 3133 Peoria Street, Unit 211, Aurora, Colorado, 80010, and which is more specifically described as follows:

A space contained within a single-story strip mall with a front door and windows that face east on to Peoria Street. The rear of the property borders a drive way that extends the entire length of the strip mall. The building has a front sidewalk and parking lot.  The unit numbers "211" appear horizontally on the outside above the front entrance to the business.



ATTACHMENT B

The terms "records" and "information," as used below, include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory, calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

1. Copies of all federal income tax returns and attachments which use an Individual Taxpayer Identification Number (ITIN).

2. Copies of all receipts for the payment of prepared federal income tax returns which use an Individual Taxpayer Identification Number (ITIN).

3. All records that relate to the following five U.S. Treasury checks.

   - Check number 2309 97078962 , dated 08/21/2009, in the amount of $2,087.00, payable to  P Nieto Porras & A Arenas Uribe, payee's address P.O. Box 211656 Denver, CO  80221-0380

   - Check number 2309 97079088, dated 08/21/2009, in the amount of $2,305.00, payable to M Apolinar Soto & G Fonseca Arenas, payee's address P.O. Box 39702 Denver, CO  80239-0702

- Check number 2309 97079125, dated 08/21/2009, in the amount of $4,250.00, payable to  Mario Carillo Lopez & M Mata Tirado, payee's address P.O. Box 100931 Denver, CO  80250-0931

- Check number 2309 97078982, dated 08/21/2009, in the amount of $3,802.00, payable to R Pineda Castillo & B Villa Mena, payee's address P.O. Box 260303 Lakewood, CO  80226-0303

- Check number 2309 97078790, dated 08/21/2009, in the amount of $1,760.00, payable to S Arando Camacho & K Losada Aragon, payee's address P.O. Box 40183 Denver, CO  80204-0183

4. All applications for the renting of postal or mail boxes.

5. All computer processing units and storage devices.

### ATTACHMENT C

I, Anthony R. Romero, Special Agent, United States Department of Treasury, Internal Revenue Service (IRS), Criminal Investigation, being duly sworn, state that:

1. I am a Special Agent for the Internal Revenue Service Criminal Investigation (IRS-CI), United States Department of the Treasury. I have been employed by the IRS since December 1994. My education includes a Bachelors of Science degree in Criminal Justice from Metropolitan State College of Denver and six months of training at the Federal Law Enforcement Training Center (FLETC). I received extensive training in conducting investigations including financial investigations for violations of the Internal Revenue Code and related crimes. This training included specific item, net worth, bank deposits, and expenditure methods of proof as it relates to the investigation and prosecution of violations of the federal income tax laws, Title 26 of the United States Code, such as tax evasion and failure to file income tax return. I received training relative to money laundering and bank secrecy, Title 18 and Title 31 of the United States Code. I also received training in constitutional law that included training in search and seizure. My duties as an IRS-CI Special Agent have involved analyzing records to determine the existence of criminal activity and to develop evidence of criminal activity. Also, my duties as a Special Agent include participating in search warrants and conducting financial investigations of individuals and businesses that have violated Federal Law, particularly those laws found under Title 18, Title 26 and Title 31 of the United States Code.

2. I have been personally involved in the investigation of Sergio A. Perez-Torres (PEREZ-TORRES), Ramiro A. Perez (PEREZ), and Alfredo H. Gonzalez (GONZALEZ), doing business as TAXES LATINOS, also known as TAXES LATINOS, LLC (TAXES LATINOS). TAXES LATINOS is a tax preparation business located at 3133 Peoria St., Unit 211, Aurora, CO 80010. GONZALEZ is the owner of TAXES LATINOS and his nephews PEREZ-TORRES and PEREZ are in charge of the day to day operations. The facts set forth in this affidavit are based upon my personal observations, my training, and information obtained from other law enforcement agents, internal IRS records, written

reports and investigative analysis. The warrant application and this affidavit are being offered for the limited purpose of showing that there is probable cause for the requested search warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter.

3.  This affidavit is made in support of a warrant to search the business known as TAXES LATINOS located at 3133 Peoria Street, Unit 211, Aurora, Colorado, 80010 (SUBJECT PREMISES). The SUBJECT PREMISES is further described as a unit in a strip mall located on the west –side of Peoria Street at 31st Ave. See Attachment A for a description of the premises to be searched. Attachment A is attached hereto and incorporated herein by reference.

4.  As set forth below, TAXES LATINOS operates the tax preparation business out of a strip mall located at the SUBJECT PREMISES. The tax returns that TAXES LATINOS prepares list the SUBJECT PREMISES as the address of the return preparer. Additionally, a sign has been identified outside the SUBJECT PREMISES which advertises TAXES LATINOS and provides contact information of (303) 366-2521.

5.  On September 24, 2009, Becky Blevins (BLEVINS) of the Criminal Tax Division of the Colorado Department of Revenue was contacted by Mr. Patrick O'Brien (O'BRIEN), whose spouse Tania Bernabe (BERNABE), was at one time employed by TAXES LATINOS.  BERNABE was in the country illegally and was reluctant to speak to law enforcement but nonetheless wanted to alert the authorities of her suspicions that illegal activities were taking place at TAXES LATINOS.  BLEVINS gave the information to Special Agent Charlie Schlaufman (SCHLAUFMAN), of the Colorado Department of Revenue Criminal Enforcement Tax Section, who then contacted O'BRIEN via a phone call on September 25, 2009.  After a brief conversation O'BRIEN agreed to meet with SCHLAUFMAN in person.  On September 28, 2009 SCHLAUFMAN and IRS-CI Special Agent John Nowowiejski met with O'BRIEN and were presented a letter prepared by the BERNABE.  The purpose of the letter was to alert the IRS that TAXES LATINOS was involved in what BERNABE believed to be illegal activities.  The letter said that BERNABE was hired by PEREZ-TORRES and PEREZ in 2007.  BERNABE believed the two men were the owners of TAXES LATINOS but later

discovered that the business is in fact owned by GONZALEZ who is the uncle of PEREZ-TORRES and PEREZ. PEREZ-TORRES and PEREZ are the day to day operators of the business.

6. In the time that BERNABE worked for TAXES LATINOS, December 2007 through September 2009, she was told by other employees that PEREZ-TORRES and PEREZ falsified client returns so as to increase the refund or decrease the amount of tax due. There were times, according to BERNABE, when the client would sign the return without realizing that false information had been added to the return. BERNABE indicated in the letter that this was done to increase the clientele and get the word out that TAXES LATINOS was a company that helps the Latin community.

7. TAXES LATINOS advertises services which include taxes and check cashing. According to BERNABE, Mr. Alejandro Jurado (JURADO) runs the check cashing operation of TAXES LATINOS. In the fall of 2009, BERNABE overheard JURADO and another employee having a conversation about PEREZ-TORRES. According to BERNABE the two men discussed how PEREZ-TORRES had a large number of P.O. Boxes opened for him by another individual. Additionally, the men were commenting on how PEREZ-TORRES had also opened 10 bank accounts as well as depositing money into JURADO'S personal account.

8. In September 2009, BERNABE was given an envelope by a friend of JURADO who had received it from JURADO with a request that BERNABE take it to the check cashing desk at TAXES LATINOS. Prior to giving the envelope to the check cashing desk BERNABE opened the envelope. Inside were several United States Treasury IRS refund checks between $1,760 and $4,250 payable to different individuals for the tax years 2006, 2007, and 2008. Each refund check listed a P.O. Box in Colorado as an address. The check number, date, amount, payee, and payee address of each refund check is listed below;

- Check number 2309 97078962 , dated 08/21/2009, in the amount of $2,087.00, payable to P Nieto Porras & A Arenas Uribe, payee's address P.O. Box 211656  Denver, CO  80221-0380

- Check number 2309 97079088, dated 08/21/2009, in the amount of $2,305.00, payable to M Apolinar Soto & G Fonseca Arenas, payee's address P.O. Box 39702  Denver, CO  80239-0702

- Check number 2309 97079125, dated 08/21/2009, in the amount of $4,250.00, payable to Mario Carillo Lopez & M Mata Tirado, payee's address P.O. Box 100931  Denver, CO  80250-0931

- Check number 2309 97078982, dated 08/21/2009, in the amount of $3,802.00, payable to R Pineda Castillo & B Villa Mena, payee's address P.O. Box 260303  Lakewood, CO  80226-0303

- Check number 2309 97078790, dated 08/21/2009, in the amount of $1,760.00, payable to S Arando Camacho & K Losada Aragon, payee's address P.O. Box 40183  Denver, CO  80204-0183

9. Suspecting fraud, BERNABE looked on the company database and found some of individuals listed on the five IRS refund checks were customers of TAXES LATINOS in the past and had their returns prepared by PEREZ-TORRES while others were not in the database.   A common fact in the five returns that BERNABE found was that other than the primary taxpayer, the spouse and dependents didn't have an SSN or Individual Taxpayer Identification Number (ITIN) prior to having a return prepared, but rather utilized TAXES LATINOS for application of an ITIN.

10. BERNABE said that TAXES LATINOS was an approved "Acceptance Agent" for the IRS which allowed TAXES LATINOS to include Forms W-7[1] with federal tax returns to generate ITINs for individuals included on the tax returns that did not already have an identifying number.  IRS records show that GONZALEZ, doing business as TAXES LATINOS, was approved to be an "Acceptance Agent" on April 17, 2008.  BERNABE said that return preparers working at TAXES LATINOS had, and utilized, a stamp of GONZALEZ's signature to sign off on the Forms W-7.

---

[1] A Form W-7 is an Application for IRS Individual Taxpayer Identification Number.  The Form W-7 is not to be submitted by individuals who have, or who are eligible to get, a social security number.

11. Copies of the checks in question were provided with the BERNABE letter dated September 26, 2009.

12. BERNABE also said that PEREZ-TORRES told her that he was planning to begin offering the service of obtaining New Mexico driver's licenses and bank accounts for undocumented individuals. BERNABE questioned the legality of this type of service. BERNABE provided information to show that TAXES LATINOS did in fact operate a type of immigration service on site and that "Ms. Thu" worked in that area.

13. 26 U.S.C. § 152 defines a dependent for tax purposes as a qualifying child or qualifying relative. A "qualifying child" may enable a taxpayer to claim several tax benefits, such as head of household filing status, the exemption for a dependent, the child tax credit, the child and dependent care credit and the earned income tax credit. In general, to be a taxpayer's qualifying child, a person must satisfy tests:

- **Relationship:** the taxpayer's child or stepchild (whether by blood or adoption), foster child, sibling or stepsibling, or a descendent of one of these.

- **Residence:** *has the same principal residence as the taxpayer for more than half the tax year.* Exceptions apply, in certain cases, for children of divorced or separated parents, kidnapped children, temporary absences, and for children who were born or died during the year.

- **Age:** must be under the age of 19 at the end of the tax year, or under the age of 24 if a full-time student for at least five months of the year, or permanently and totally disabled at any time during the year.

- **Support:** Did not provide more than one-half of her own support for the year.

    A "qualifying relative" may enable a taxpayer to claim the same benefits as a "qualifying child."

    In general, to be a taxpayer's qualifying relative, a person must satisfy the following tests:

- **Not a qualifying child:** The dependent cannot be a qualifying child of another taxpayer.

- **Gross Income:** The dependent earns less than the personal exemption amount during the year.

- **Total Support:** You provide more than half of the dependent's total support during the year.

- **Relationship:** You are related to the dependent.

- **Joint Return:** If the dependent is married, the dependent cannot file a joint return with his or her spouse.

- **Citizenship:** The dependent must be a citizen or resident alien of the United States, Canada, or Mexico.

15.   An ITIN is one form of a Taxpayer Identification Number issued by the Internal Revenue Service. It is a nine-digit number that always begins with the number 9 and has a range of 70-88 in the fourth and fifth digit, example 9XX-70-XXXX. The IRS issues ITINs to individuals who are required to have a U.S. taxpayer identification number but who do not have, and are not eligible to obtain, a Social Security Number (SSN) from the Social Security Administration (SSA). ITINs are issued regardless of immigration status because both resident and non-resident aliens may have a U.S. filing or reporting requirement under the Internal Revenue Code. Individuals must have a filing requirement and file a valid federal income tax return to receive an ITIN, unless they meet an exception. ITINs are for federal tax reporting only, and are not intended to serve any other purpose. An ITIN does not authorize work in the U.S. or provide eligibility for Social Security benefits or the earned income tax credit. ITINs are not valid identification outside the tax system. IRS issues ITINs to foreign nationals and others who have federal tax reporting requirements and do not qualify for SSNs.

16.   GONZALEZ, as the owner of TAXES LATINOS, LLC made application to the IRS on November 11, 2007 to become a Certified Acceptance Agent (CAA). This application was approved on April 17, 2008. A CAA is an individual, business or organization authorized by the IRS to assist individuals in obtaining ITINs. CAAs review applicants' documentation, complete a certificate of accuracy, and forward the certificate and application to the IRS for processing. This approval allowed TAXES LATINOS, among other things, to include individuals on federal tax returns as dependents utilizing Form W-7 based on an in house certification process and prior to the actual ITIN being generated by the IRS. The CAA agreement with the IRS allows the CAA to forward the Form W-7 to the IRS with the tax return to generate an ITIN for the individual claimed on the return without having to provide the supporting documentary evidence to the IRS.

17.   The purpose of the IRS Scheme Development Center (SDC) is to screen suspected fraudulent returns, detect refund fraud and return preparer schemes and refer them to the IRS Criminal Investigation field offices for further investigation.

18.   In December 2009, at the request of IRS-CI Special Agent John Nowowiejski, the Ogden, Utah SDC ("OSDC") prepared and forwarded a return preparer scheme package for TAXES LATINOS. The scheme package was requested due to the aforementioned informant letter dated September 26, 2009. As mentioned previously, the letter provided by BERNABE identified GONZALEZ as the owner of TAXES LATINOS and his nephews, PEREZ-TORRES and PEREZ, as the individuals operating the day-to-day business operations. The scheme package showed that three different Taxpayer Identification Numbers (TIN) were utilized on the returns prepared by TAXES LATINOS; SSN 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, EIN 26-1302065, and EIN 20-5676365. A TIN is an identification number used by the IRS in the administration of tax laws. An individual's SSN is issued by the SSA whereas all other TINs are issued by the IRS. An Employer Identification Number (EIN) is also known as a Federal Tax Identification Number (FTIN), and is used to identify a business entity.

19.   The OSDC identified 2791 federal income tax returns prepared by TAXES LATINOS for the 2008 tax year; of those returns 99% claimed and received refunds totaling $8,580,877. ITIN dependents were claimed including some that were reported as a "Niece" or "Nephew". Almost all income reported was eliminated by the exemption amount and dependent related credits claimed. The clients' occupations varied with the majority falling under a type of labor service. Of the 2791 returns filed, 1847 or 66% of the primary filers were aliens.

20.   The OSDC identified 2329 federal income tax returns prepared by TAXES LATINOS for the 2007 tax year; of those returns 97% claimed and received refunds totaling $6,030,017.

21.   The OSDC identified 1827 federal income tax returns prepared by TAXES LATINOS for the 2006 tax year; of those returns 97% claimed and received refunds totaling $4,171,799.

22.   As part of the scheme package, the OSDC sent fifteen of the 2,791 2008 federal income tax returns and included the actual returns in the package. Of the 15 federal income tax returns, all were electronically filed, 13 were Forms 1040A and 2 were Forms 1040. All of the returns resulted in a refund with ranges from $5,783 to $8,614. The 15 referenced federal income tax returns contained the following information

- Twenty-four individuals are listed on the fifteen returns, which includes 15 primary taxpayers and 9 spouses. Of the twenty-four individuals, sixteen claim Form W-2 income, but fourteen of the sixteen individuals cannot be identified through SSA records. (The only income reported is derived from a prior year state refund issued by the State of Colorado Department of Revenue).
- Each of the referenced fifteen returns claims an Additional Child Tax Credit (ACTC) ranging from $4,242 to $5,836.
- There are a total of ninety-nine (99) dependents claimed on the 15 returns. Six or more dependents are claimed on thirteen of the fifteen referenced returns.
- Fifty-eight (58) of the claimed dependents are listed as either "Niece" or "Nephew". 21 are listed as a "Son", 14 are listed as a "Daughter", 3 are listed as a "Parent", and 3 are listed as a "Sibling".
- Eight spouses use an ITIN on 8 of the referenced 15 returns.
- On fourteen of the fifteen referenced returns, the tax is completely eliminated due to the number of exemptions claimed. Exemption amounts claimed on the returns range from $24,500 to $35,000.
- Each of the 15 returns, had Form W-2 income reported under an ITIN which had not been reported to SSA.

23.   In summary, the Forms W-2 were questionable as the income had not been reported to the SSA. A query of an internal IRS taxpayer database showed that the W-2 income was reported to the IRS by the employers for 8 of the 15 referenced returns. Consistent with BERNABE allegations, "qualifying child" and more prevalent, "qualifying relative" dependent ITIN's certified by TAXES LATINOS on Forms W-7 were used for the sole purpose of creating a larger tax refund.

24.   As of March 3, 2010, TAXES LATINOS had prepared 1511 federal income tax returns for tax year 2009. On 488 of these returns, or 52%, an ITIN was used by the primary taxpayer. The refunds ranged from $11.00 to $9,578.00 for the returns using an ITIN as the primary SSN.

25.   In March 2010, the OSDC provided copies of the negotiated checks which were identified by BERNABE. The five checks in question totaled $14,204.00. Based on my non-expert opinion the endorsement on each check is a different name written by the same person.

26.   On February 18, 2010, two undercover operations were executed by two IRS-CI undercover (UC) agents. The operations were designed to have TAXES LATINOS prepare 2009 Federal Forms 1040, U.S. Individual Income Tax Returns. Each agent used an Adaptive Digital Systems "Raven" covert audio/video device to record their meeting with a TAXES LATINOS return preparer. Additionally, the covert audio/video device recorded the interior layout of TAXES LATINOS as well as the employees that were present.

27.   During the first recorded operation on February 18, 2010, UC Agent #1 (UC1) entered the SUBJECT PREMISES at 10:10 A.M.. Upon entering the business UC1 checked in with the secretary who was located at a desk against the wall immediately to the left of the entrance. UC1 was assigned a number and told to wait for the number to be called. UC1 then walked to the waiting area which was located in front of, and to the right as one enters, the SUBJECT PREMISES. UC1 surveyed the interior of the business with his "Raven" audio/video recording device while he was waiting for his number to be called. The return preparers for TAXES LATINOS are located towards the rear of the business as one enters the SUBJECT PREMISES. Each of the return preparers has a computer work station with the number of the work station hanging from the ceiling directly above. The video captured by UC1 shows at least 10 workstations. Towards the rear of the SUBJECT PREMISES, behind the return preparer stations, there is a separate office where UC1 was told PEREZ-TORRES works. This area contains at least one computer and several filing cabinets. There appeared to be several filing cabinets located throughout SUBJECT PREMISES as well as at least one fax machine.

28.   UC1 was assigned to a woman by the name of Veronica to prepare his 2009 Federal income tax return. Veronica led UC1 to an office behind the work stations which she later said belonged to the boss, PEREZ-TORRES.

29.   UC1 provided Veronica with a Form W-2 and informed her that his wife and son were Mexican citizens and currently residing in Mexico. UC1 did not have documentation to show he was married with one child. If prepared correctly, the Federal Form 1040, using single filing status,

for tax year 2009 would have resulted in $877 due to the IRS. The computation of the correct return was performed by an IRS-CI Special Agent using Turbo Tax software.

30.     Veronica asked if UC1 had any kind of documentation for his wife and son. UC1 said that he didn't. Veronica then asked if UC1 had an ITIN for both his wife and son. UC1 said that he didn't have an ITIN for his wife or son. Veronica than said, concerning ITIN'S.... *"It's just basically for tax purposes. It's a... it's like a social security number that the IRS gives you and it's just especially for that. So you can claim her and you should be able to get, you know, your....the credit for filing jointly and for your child so you can get the child credit..... I can help you with your application. It's just you would have to mail it out...the only way you can apply for your ITIN is with your income tax return. So all you would need is a picture ID, copy of a picture ID and a copy of her birth certificate."*

31.     Concerning the documentation that would be necessary for UC1's son, Veronica said..." *you would need his birth certificate and some school records. Just a letter stating he's going to school."*

32.     Veronica said that UC1 would need to obtain copies of his wife's identification card as well as her birth certificate. Once these documents were provided to TAXES LATINOS, Veronica said that she would be able to prepare a Form 1040 Individual Income Tax Return for UC1 that would generate a refund of $2,237.00. Without the additional information, Veronica informed UC1 that he would owe the IRS $840.00 for tax year 2009, which amount is slightly less than the amount calculated by the IRS that would be due and owing for tax year 2009 if the return was prepared correctly. Since UC1 was not given a copy of his return, it's unclear as to why there was a $37.00 discrepancy between the return prepared by IRS-CI prior to the meeting and the return generated by Veronica at TAXES LATINOS.

33.     The meeting concluded when UC1 said that he would try to obtain the necessary additional documentation from his wife. UC1 exited TAXES LATINOS at 10:29 A.M.

34.     UC Agent #2 (UC2) entered the SUBJECT PREMISES at 10:15 A.M. on February 18, 2010.

Upon entering the business, UC2 checked in with the secretary who was located at a desk against the wall immediately to the left of the entrance. UC2 was then directed to a female return preparer located at station #7.

35.   UC2 was assigned a woman named Alejandra to prepare his return. The UC2 said that he had recently moved to Colorado from Nevada to find work in construction in the Denver area. UC2 provided Alejandra a Form W2 which showed he earned $34,852.01 in 2009 and had federal income tax withholding in the amount of $661.82. Additionally, UC2 said that he had a ten year old son that lived in another state with the child's mother. If prepared correctly, the Federal Form 1040 for tax year 2009 should have shown $131.00 due to the IRS. The computation of the correct return was performed by an IRS-CI Special Agent using Turbo Tax software.

36.   UC2 told Alejandra that he had heard through acquaintances that he might be able to get a refund since he had relatives living in Mexico. Alejandra said that this was true *"If you have some, you know, family and in any sort of way you send money to Mexico, you can claim them, your nieces and nephew and you can get the...the child tax credit for them".* *"If you in any sort of way, even if it's... the money's not for them, you can claim them."* Alejandra said that this was accomplished through the use of an ITIN. UC2 asked how much he needed to send to his relatives in Mexico to which Alejandra replied *"It... it doesn't require any amount as long... as long as you can prove that in any sort of way you send money to Mexico."* Alejandra added *"we're not doing anything illegal, it's just, you know, you have family in Mexico and you help them or you're allowed to pay."*

37.   Alejandra's initial computation showed UC2 was not eligible for a refund with the information he had provided. *"As of right now you owe money to the government totaling $181.00."*

38.   Alejandra then recommended that UC2 contact his relatives in Mexico in order to obtain the information necessary to issue ITINs for his niece and nephew. UC2 would be able to obtain a refund of $2,962.00 if he could arrange for his relatives to provide him with 2 sets of birth certificates and immunization records. If UC2 could add one more dependent, the refund would

be $4,327. *"Well, if we put two whoever, your nephew or nieces, they'll give you 292...$2,962...You don't need to show anything. I was just saying because, you know, the IRS knows that we have family in Mexico... The IRS knows that we help our families in Mexico. If for some reason you get audit, they're going to ask you okay, well, let's say you do have family in Mexico and you can prove that because you do...have family, you can have, you know, this is my legal niece and my... my... even... even a friend of yours, even if you have friends in Mexico that have kids...and then you -- you can get a letter from them saying...saying that David...Mario help us with certain amount of money every two weeks or every month, whatever. That's the only thing they ask you for."* When UC2 asked if there was a way that the IRS could verify that he did send money to family in Mexico and if he would need to provide proof such as receipts, Alejandra responded *"You don't have to give anything....It's just that.... it's just that letter... That's the only thing you need. A lot of people do it. Everybody here we recommend them so there is no problem...we're not going to tell you something that's going to hurt you."*

39.   Alejandra told UC2 that if he was able to obtain more than two sets of documents he would be able to get a refund of up to $5,692.00 and that he could use the ITINS every year from that point. Alejandra also suggested to UC2 that he could "send them money" if he wanted, referring to his nieces and nephews, because he did "make a lot of money" referring to the tax refund. Alejandra also told UC2 that TAXES LATINOS charges $29 for each ITIN generated.

40.   UC2 told Alejandra that he was going to attempt to contact relatives in Mexico and obtain the necessary paperwork to generate a refund on his 2009 Federal income tax return. UC2 told Alejandra that he had not talked to his aunt, who was in Mexico and would be supplying the information required by TAXES LATINOS, *"Shoot, I haven't seen them for years."* UC2 exited TAXES LATINOS at 10:36 A.M. on February 18, 2010.

41.   UC2 re-entered TAXES LATINOS at 11:54 A.M. on Thursday February 18, 2010 and made contact with the Alejandra. UC2 presented two sets of birth certificates and immunization records to Alejandra and expressed apprehension because he didn't know the children in question.

Alejandra reassured UC2 that he had nothing to worry about as long as the parents of the children in question could provide a letter stating that UC2 provided financial support... *"I mean, they want to believe documents from Mexico and, you know, you can do whatever...you can give any type of paper, you can call your aunt and say it's for me a letter saying that I do support those kids and saying that...signed by the parents and...and then you get the thing, you send it to them and they're okay with that."*

42. When asked about the training TAXES LATINOS employees received as far as tax preparation, Alejandra said that the business trained all the employees.

43. Alejandra told UC2 that TAXES LATINOS provides insurance and immigration services in addition to tax return preparation.

44. Alejandra told UC2 that an individual does not even need to be related to you to be able to use them as a dependent on a tax return.

45. Alejandra told UC2 that "Sergio" was the boss but that his older uncle "controls everything". She also told UC2 that Sergio trained everyone.

46. UC2 noticed that the entire tax preparation area was under camera surveillance. Alejandra told UC2 that Sergio has cameras on every tax preparer so he could monitor the work being done... *"He sat home and watched all of us work."*

47. Alejandra, working as a representative for TAXES LATINOS, prepared a 2009 Form 1040A Federal income tax return for UC2 which generated a refund of $2,962.00. Two dependents were added to the Form1040A that did not qualify as dependent relatives in 2009. The two children in question did not meet the qualifying child or qualifying relative dependency tests. Furthermore, UC2 said that he did not know the children in question and reiterated that they were in Mexico, not the United States. UC2 explained to Alejandra that he did not wish to file his return electronically. UC2 instead signed the return and took the return, along with the Forms W-7, with him when he left TAXES LATINOS. UC2 paid TAXES LATINOS $133.00 for the preparation of his return. $77.00 was paid for the return preparation and $28.00 was paid for each of the two

ITIN's issued to UC2. A receipt was provided to UC2 by Alajandra. This receipt was generated by Alejandra using her TAXES LATINOS computer. During the operation the "Raven" audio/video recorder captured Alejandra using a computer to prepare the return for UC2.

48.     As mentioned earlier, if prepared correctly, the individual income tax return for UC2 would have shown a tax due and owing in the amount of $131. Instead, due to the additional dependents on the Form 1040 tax return prepared by Alejandra, UC2's tax return for tax year 2009 shows a tax refund of $2,962.00. This results in a $3,093.00 difference in taxes collected by the government.

49.     Based upon my training and experience as an investigator with the IRS-CI, I know tax preparers normally maintain records at their business location that are directly related to their tax preparation business. These records include client identifying information, including social security numbers and addresses, client files including work papers generated by the return preparer relative to the preparation of the client's tax returns, and current and former returns prepared for the client by the return preparer.

50.     Based on my knowledge training and experience and consultation with other investigators, tax preparers who have been preparing tax returns for multiple years have records stored throughout the location used to operate the business. These records are often found in different media forms. Furthermore, the IRS requires return preparers to retain client records for three years. Retaining these records aids the return preparer in the preparation of subsequent tax returns on behalf of the client.

51.     Paid return preparers typically use computers and software programs for the preparation of tax returns. Tax preparers also normally maintain business records on computers including various types of mass storage devices such as hard drives, thumb drives, flash drives, and disks. These computers normally consist of current and previous tax returns prepared for clients, calculations made to determine tax return figures for clients, and identifying information for clients, such as names, social security numbers, and addresses.

52.     The 15 Federal Forms 1040 provided by the OSDC appear to be computer generated and were

filed electronically. The form 1040 prepared for UC2 was prepared on a TAXES LATINOS computer by Alejandra who then provided the original document to UC2.

53.  UC1 and UC2 observed, separately, a large main area with several work stations where tax returns were prepared. Each work station had a computer that was used by a TAXES LATINOS employee to prepare tax returns.

54.  Employees of TAXES LATINOS used computers that were located in the office space of the SUBJECT PREMISES where the UC1 and UC2 met with TAXES LATINOS return preparers during the undercover operation on February 18, 2010. Veronica and Alejandra, the TAXES LATINOS return preparers for UC1 and UC2, made entries on their computer monitors using the respective keyboards during the undercover operations. The return prepared for UC2 for tax year 2009 was printed out and signed by UC2, who then took the return with him. UC1 was not given a copy of his return because it was never completed. UC1 did not pay a fee to TAXES LATINOS because his return was never completed. UC2 paid TAXES LATINOS a total of $133.00. The preparation of the return cost $77.00 and the preparation of each Form W-7 cost $28.00.

55.  During the course of this investigation, I consulted with David Riordan Computer Investigative Specialist (CIS) Special Agent with IRS-CI. After consulting the S/A-CIS Riordan, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripheral equipment) to be imaged and searched later by a qualified computer specialist in a laboratory or other controlled environment.

56.  This application seeks permission to search and seize records, computers, and electronic storage media that might be found at the SUBJECT PREMISES. Some of these electronic records might take the form of files, documents, and other data that is user generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

57.  For example, based upon my knowledge training and experience, I know that a powered-on computer maintains volatile data. Volatile data is defined as active information temporarily

reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks, floppy, tape and/or CD-ROM and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

58.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been created or downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

59.    Also, again based on my training and experience, wholly apart from user-generated files, computer storage media, in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what is has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph

that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information, such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

60.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

61.     "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

62.     Searching Computers for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data

stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

63.    Based upon my knowledge, training, and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of the data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

64.    The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

65.    The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stores data to determine which particular files are evidence or instrumentalities of the crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

66.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before

a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

67.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.


_____

Anthony R. Romero
Special Agent, IRS-CI


Subscribed and sworn to before me

this ___14TH___ day of ___April___, 2010. At 4:25 p.m

_____
UNITED STATES MAGISTRATE JUDGE

MICHAEL J. WATANABE
U.S. MAGISTRATE JUDGE
DISTRICT OF COLORADO